## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**DONALD LEE MOSS,**

     **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　**Case No.:**

**CSX TRANSPORTATION, INC.,**
**a Virginia Corporation,**

     **Defendant.**

_____/

## COMPLAINT

Plaintiff sues Defendant and states:

### JURISDICTION AND VENUE

1.　　This action for monetary damages, for declaratory and injunctive relief, and for other equitable and ancillary relief is brought under The Federal Railroad Safety Act, 49 U.S.C. § 20109.

2.　　This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claim arises under the laws of the United States.  Further Specific jurisdiction arises under 49 U.S.C. § 20109(d)(3).

3.　　Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because

1

Defendants corporate headquarters is in Jacksonville, Florida, and because most transactions and occurrences pertinent hereto took place in Jacksonville, Florida.

4.    Plaintiff Donald Lee Moss ("Plaintiff" or "Moss") is a citizen of the United States and a citizen and resident of the State of Florida, who resided in Florida at all times material hereto.

5.    Defendant CSX Transportation, Inc., is a Virginia corporation with its headquarters in Jacksonville, Duval County, Florida.

6.    This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

## CONDITIONS PRECEDENT

**7.**    Plaintiff has exhausted all conditions precent by conducting proceedings before the U.S. Department of Labor in which the Secretary has not issued a final decision within 210 days. All conditions precedent to bringing this action have occurred or been fulfilled.

## GENERAL ALLEGATIONS

8.    At the time of his constructive discharge, Plaintiff had worked 30 years in the railroad industry, with 26 of those years spent at CSX. At the end of his employment, he was Chief Engineer, Maintenance of Way North.

9.    Plaintiff resigned effective February 7, 2022.  The resignation was a

constructive discharge.  Plaintiff suffered severe retaliation for his objections to violations of railroad safety by CSX.

10.    Plaintiff learned of two derailments on two consecutive days of CSX trains that occurred on November 7-8, 2021, in Syracuse, NY, at the Syracuse Intermodal Facility.

11.    CSX sought ways to evade mandatory reporting of these derailments to the Federal Railroad Adm9inistration (FRA).

12.    CSX employee John Parr got instructions from then-Senior Vice President Ricky Johnson to drop off a switch for a contractor working on the derailment and not to charge for it.   The absence of this expense reduced the cost of the derailments to amounts lower than the amount that would make the derailments reportable events.  These amounts were $11,300 in 2022 and $11,200 in 2021. Such strategies had become common at CSX.

13.    There followed a derailment in Birmingham, AL, on December 3, 2021, to which Plaintiff responded.   He reported to Johnson a "conservative" $19,000 estimate to fix the track signals that had been damaged by the derailment. Johnson called the $19,000 figure "bullshit" because he did not want to report the incident, even though $19,000 was on the low end of what it would cost to fix the signals.   Safety incidents are reportable when the costs of repair exceed certain amounts – again, $11,300 in 2022 and $11,200 in 2021.

14.    Plaintiff coordinated with his colleagues, John Parr, Assistant Chief Engineer of Communications and Signals, and Carl Walker, Chief Engineer of Communications and Signals, about the cost to repair the damages done to the Signals Department's portion of the derailment. In their discussion, both Parr and Walker expressed concerns that the repair cost would be "reportable" to the FRA.

15.    Later that day, Vice President of Network Operations Greg Jaggernauth emailed Walker and Johnson and asked Walker, "[A]nything we can do to the $19k cost to get under reportable?" Eventually, at the direction of Johnson, CSX Signals Department employees reduced the original $19,000 estimate, which Parr had said was "conservative," to $8,000, then $5,200, and finally to below $1,000. This was far below the actual cost. The reductions were accomplished by simply fudging the estimates to achieve the non-reportable result.

16.    On December 6, 2021, Plaintiff had follow-up discussions with John Parr about these dishonest damage valuations. Parr said he had become used to Johnson bullying him to report a number that was not a reflection of the actual damage, but that would make the incident non-reportable. Plaintiff, up to this point, had only a vague sense of what was going on.

17.    But December 9, 2021, brought another derailment, this time in Baldwin, FL. Plaintiff got a more direct taste of the fraud when Johnson sent him a text about the Baldwin derailment saying, "make sure it is not reportable." Johnson

at that time had no idea whether there were injuries or hazmat spills or anything.  He just wanted to be sure that the derailment was processed as non-reportable.

18.    On Friday, December 10, 2021, Plaintiff had a more intense phone call with Parr.  This is when Plaintiff learned the details of the Syracuse misreporting.  When Plaintiff asked, Parr confirmed that he had made the false reports under orders from Johnson.    Plaintiff then asked if Parr had cleared it with his superior, Carl Walker.  Parr confirmed that he had cleared the fraud with Walker.  Walker had told Parr that, "Ricky [Johnson] is the boss and it is his order."

19.    During January, 2022, Plaintiff worked on a whistleblower letter to CSX CEO and President James Foote about the fraud in failures to report.  On January 18, 2022, Plaintiff met for lunch with Carl Walker and showed Walker his proposed letter to Foote.  Walker repeated that Parr had just done "what the boss told him to do."  Walker refused Plaintiff's offer to co-sign the letter.  Walker correctly predicted that there would just be a "bullshit investigation," nothing would change regarding the treatment of reporting to the FRA, and that those signing the letter would receive retaliation.  Plaintiff said he had to send the letter anyway because of what Parr had reported to him.

20.    Plaintiff sent the letter to Foote on January 21, 2022, copying several other executives and members of the board of directors.

21.    That same day, Johnson called Plaintiff into his office without notice.

5

Plaintiff found the Director of Human Resources already there. Johnson launched into a hostile and accusatory round of questioning aimed at portraying Plaintiff as vengeful about a perceived rival.  Gaining no traction there, Johnson shifted to derailments.  Plaintiff cut off questioning, asking if this was about his letter to the CEO, stating that this was retaliation against him, that he expected an investigation, and the investigation would speak for itself. Plaintiff said he was uncomfortable because the meeting felt retaliatory.  He left.

22.    January 24, 2022, brought an email from Michael Burns, Vice President – General Counsel.  The email asked Plaintiff to speak with attorneys from Jones Day, allegedly hired to investigate the allegations in the letter.  Plaintiff reluctantly agreed, though he was not permitted to bring a lawyer of his own.

23.    The interview came on January 31, 2022, via video conference.  The attorneys were Jacqueline Holmes and Deborah Sudbury.  Plaintiff explained the details and showed the pertinent documents to the lawyers.  The lawyers seemed more interested in discrediting Plaintiff than gathering facts.

24.    The next day, February 1, 2022, brought an email from Nordica Solomon, Director, Executive Compensation, transmitting a confidentiality and non-compete agreement that Plaintiff would have to sign, "to continue to be eligible for participation in future Long-Term Incentive Plan ("LTIP") awards, including but not limited to performance units, stock options and/or restricted stock units, as approved

6

by the Compensation & Talent Management Committee of the CSX Board of Directors." The LTIP was about 60% of Plaintiff's income.

25.     The proposed non-compete was so restrictive that Plaintiff would have to abandon his pending whistleblower efforts and refrain from any others.

26.     Moreover, the CSX job was obviously coming to an end for Plaintiff. Management appeared already to have the wheels in motion for his termination.  The mandated confidentiality agreement would restrict even his internal communications. Nor were there any exceptions for communications with regulatory agencies or government investigators.  The non-compete would make it impossible for him to work in the railroad industry, to which he had given 30 years of his life and had planned for 10 more.  He would be silenced and unemployable.

27.  Plaintiff got a glimpse of his fate in the company on February 4, 2022, when CSX Executive Vice President of Operations Jamie Boychuk, arguably the second highest company official, spoke in a conference call without realizing that Plaintiff was among the participants.  Boychuk said it looked like a snowstorm was coming to Albany and that would be a good place to send Lee Moss.  The assignment to Albany was duly made.  This was an extraordinary assignment.  Previously such assignments might be made in advance of an impending disaster such as a hurricane, but never a snowstorm. Moreover, snow fall could affect Carl Walker's operations,

but not Plaintiff's. The assignment was simply to cause discomfort and inconvenience for Plaintiff and to ruin a weekend.

28.     Boychuk delegated the task of ordering Plaintiff to Albany for the weekend to Plaintiff's superior, Greg Mellish, who called midday on Friday to deliver the order.  Plaintiff assumed this meant getting to Albany after the day's meetings or in the morning. When Plaintiff had not left early enough to suit Mellish, Mellish called again around 4:00 with disparaging commentary and a disrespectful tone, demanding to know why Plaintiff had not left yet.  Plaintiff explained that there were no flights to Albany until the next morning. In that call and a sequence of demeaning texts Mellish demanded that Plaintiff find a fight to some other city and rent a car to drive several hours to Albany in the bad weather.  Since the whole trip was just a harassment stunt, Plaintiff got the message to get out.

29.     Plaintiff noticed that he was being left off correspondence and out of meetings in which he was commonly included.

30.     Johnson withheld Plaintiff's performance review, bonus, and 2022 raise documents, while he sent these things promptly to all the other employees at the same level, as was the custom of many years.

31.      Johnson never met with Plaintiff to go over these matters. This was a critical meeting within the company culture.

32.     Seeing the writing on the wall, on February 6, 2022, Plaintiff sent a

resignation letter, effective February 7, 2021.

33.    Plaintiff had hoped to work 10 more years before retirement.  He needed only five more months of railroad employment to be eligible for more generous retirement benefits. He sought another position in the industry and found a consulting job with Herzog.

34.    But CSX was not done with its retaliation.

35.    In June 2022, Johnson called the Chief Operating Officer of Herzog and warned the COO about Plaintiff to tarnish Plaintiff's reputation. Johnson insisted that Plaintiff not be allowed to communicate with anyone at CSX in Johnson's department during Plaintiff's consulting for Herzog.

36.    As a restraint on a consultant who benchmarks processes across all railroads and optimizes industry processes, this was nearly a deathblow to Plaintiff's career. Johnson did not explain why Plaintiff should not be able to communicate with CSX.  It was simple gratuitous retaliation.

37.    Following the temporary gig at Herzog, Plaintiff landed a permanent position at Amtrak.  On August 30, 2022, an Amtrak executive, Larry Biess, informed Plaintiff that he had received a call from Greg Mellish, a chief engineer at CSX, who said that he heard that Lee Moss was coming to work at Amtrak.  Biess told Mellish he did not know of a final decision, but he knew higher-ups had been recruiting Plaintiff.  Mellish responded that Amtrak's higher-ups need to know that

Moss left CSX on extremely bad terms and under bad circumstances that left CSX "up to our eyeballs in attorneys investigating us."  Mellish added that Lee Moss had been "banned from the property."

38.     Thus the retaliatory animus of CSX extended not only to Plaintiff's remaining time with the railroad after his whistleblower letter, but also to at least two affirmative efforts to interfere with Plaintiff's career at two subsequent employers.

39.     Plaintiff has had to retain counsel to vindicate his rights in this matter and owes a reasonable attorney's fee and costs of litigation.

## CAUSE OF ACTION
## Violation of 49 U.S.C. § 20109 – Federal Railroad Safety Act

40.     Plaintiff incorporates Paragraphs 1-39.

41.     By providing the whistleblower letter to CSX CEO James Foote, as described above, Plaintiff engaged in protected conduct in accordance with 49 U.S.C. § 20109(1)(c), by providing information concerning the violation of federal law concerning railroad safety and security to a "person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct."

42.     CSX engaged in adverse action by harassing Plaintiff in retaliation for his protected conduct to an extent and in a manner that was intolerable and that made clear that his termination was imminent, thus forcing him to resign his position.

43.    CSX was aware of Plaintiff's protected conduct and took the retaliatory actions because of that protected conduct.

44.    Plaintiff has suffered damage as a result of Defendant's unlawful retaliation.

## **PRAYER OF RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a)    that process issue and this Court take jurisdiction over this case;

b)    judgement against Defendant and for Plaintiff awarding compensatory damages for lost income and garden-variety emotional distress and loss of enjoyment of life for the Defendant's violations of law enumerated herein;

c)    punitive damages in the amount of $250,000;

d)    judgement against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein and reinstatement for the Plaintiff, remedying all benefits of which Plaintiff has been unlawfully deprived;

e)    prejudgment interest;

f)    judgement against Defendant and for Plaintiff awarding Plaintiff his attorney's fees and costs;

g)    all equitable relief that is allowed by law;

h)    such other and further relief as is appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Filed this 7th day of March, 2025.

Respectfully submitted,

*/s/Richard E. Johnson*
Richard E. Johnson
Florida Bar No. 858323
Law Office of Richard E. Johnson
314 West Jefferson Street
Tallahassee, Florida 32301
Telephone: (850) 425-1997
Facsimile: (850) 561-0836
rick@rej-law.com

Lisa C. Lambert
Florida Bar No. 495298
Law Office of Lisa C. Lambert
245 North Highland Avenue
Suite 230-139
Atlanta, GA 30307
404.556.8759
lisa@civil-rights.attorney

*Attorneys for Plaintiff*