**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DONALD LEE MOSS,

        Plaintiff,

v.                                                                              Case No.: 3:25-cv-257-WWB-LLL

CSX TRANSPORTATION, INC.,

        Defendant.

_____/

## ORDER

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 49), Plaintiff's Response in Opposition (Doc. 51), and Defendant's Reply (Doc. 52). For the reasons set forth below, Defendant's Motion will be denied.

## I.    BACKGROUND

Plaintiff, Donald Lee Moss, began working for Defendant, CSX Transportation, Inc. ("**CSX**") in 1996 as a track supervisor. (Doc. 50-1 at 19:6–15). After a series of promotions, by 2022 Plaintiff was the Chief Engineer North for CSX. (*Id.* at 19:14–22:12, 26:16–19). In that role, Plaintiff was responsible for ensuring the safety of the employees in the engineering department and the safety, inspection, maintenance, and repair of the infrastructure, such as tracks and bridges. (*Id.* at 23:3–18). From 2016 to shortly before his resignation, Plaintiff reported to the head of the engineering department, Ricky Johnson. (*Id.* at 24:1–9). Due to organizational changes in December 2021, Plaintiff began reporting to Greg Mellish, who had been promoted to the Assistant Vice President of Engineering. (*Id.* at 24:10–13, 24:23–25:6. 101:9–11; Doc. 50-2 at 60).

In late 2021, CSX experienced a series of derailments.  (Doc. 50-1 at 58:23–60:1; Doc. 50-4 at 41:23–42:4; *see also* Doc. 13, ¶¶ 13, 17).  In responding to the incidents, Plaintiff felt that Johnson and other executives were applying pressure and asking employees to falsely report the costs of the derailments to avoid having to report the derailments to the Federal Railroad Administration.  (Doc. 50-1 at 58:4–22; Doc. 50-2 at 63–64; Doc. 50-9 at 198, 201).  On January 18, 2022, Plaintiff had lunch with Carl Walker, the chief engineer of communications and signals at all times relevant to this litigation, and discussed a letter with him that Plaintiff intended to send to CSX executives.  (Doc. 50-1 at 124:11–125:10; Doc. 50-4 at 8:14–9:7).  Walker declined to sign the letter and cautioned Plaintiff against sending it.  (Doc. 50-1 at 124:14–125:15).  Nevertheless, on January 21, 2022, Plaintiff sent the letter to Jim Foote, the CEO of CSX, and several board members by certified mail, outlining his concerns regarding the reporting of derailments.  (Doc. 50-2 at 14, 63–65).  Plaintiff also sent the letter to Foote by e-mail on the evening of January 21, 2022.  (Doc. 50-1 at 119:10–14; Doc. 50-2 at 62).

The same day he sent the letter, Johnson called Plaintiff into his office to meet with him and a member of the human resources department.  (Doc. 50-1 at 79:25–80:6, 113:18–115:2; Doc. 50-9 at 83:1–9, 85:16–18).  Initially, Johnson attempted to discuss Plaintiff's unhappiness with the decision to promote Mellish instead of Plaintiff.  (Doc. 50-1 at 115:2–9; Doc. 50-9 at 68:2–21).  When Plaintiff denied that he was upset about the promotion and was willing to work for Mellish, Johnson abruptly changed the topic to the derailments and asked Walker to be brought into the meeting.  (Doc. 50-1 at 115:6–13; Doc. 50-4 at 55:5–9, 55:25–56:6; Doc. 50-9 at 68:25–69:3, 85:19–21).  Not wishing to

2

discuss the issue in light of his letter to Foote, Plaintiff left the meeting. (Doc. 50-1 at 115:14–116:4, Doc. 50-4 at 56:20–57:5; Doc. 50-9 at 67:13–20, 86:2–12).

The following Monday, attorneys with Jones Day scheduled an interview with Plaintiff to discuss his letter. (Doc. 50-1 at 51:21–52:7, 93:7–11). Plaintiff was interviewed on January 31, 2022, and felt that the interview was adversarial in nature and that the attorneys were attempting to discredit him and his claims. (*Id.* at 50:12–21, 158:7–25; Doc. 50-2 at 7).

On February 1, 2022, at roughly 7:30 p.m., Plaintiff received an e-mail from the executive director of compensation requesting that Plaintiff review, sign, and return a Confidentiality, Non-Solicitation and Non-Competition Agreement on or before February 14, 2022. (Doc. 50-2 at 66). Failure to agree to the term of the contract would not have resulted in termination but would have resulted in the loss of participation in the Long-Term Incentive Plan ("**LTIP**"). (*Id.*; Doc. 50-8 at 35:5–14). The LTIP accounted for roughly fifty to sixty percent of Plaintiff's compensation in the relevant time frame. (Doc. 50-1 at 161:22; Doc. 50-7 at 21–22). The decision to include all head of department level employees and above in operations in the pool of employees required to sign non-compete agreements was made in roughly August 2021. (Doc. 50-7 at 26–29, 67). The list of individuals that were required to sign was circulated on January 13, 2022. (Doc. 50-2 at 98; Doc. 50-7 at 32–33, 72). A number of employees received the e-mail after business hours on February 1, 2022, into the early morning hours of February 2, 2022. (Doc. 50-2 at 74–97).

Although Plaintiff received an e-mail from Johnson on January 27, 2022, setting forth his bonus and raise for 2022, Johnson failed to schedule an in person meeting to

3

discuss his performance by the suggested January 28, 2022 deadline. (Doc. 50-1 at 143:14–144:24; Doc. 50-2 at 100, 104–105). Instead, Johnson sent Plaintiff an invite to meet on February 7, 2022. (Doc. 50-2 at 106).

On February 4, 2022, Plaintiff joined a meeting by telephone, although many of those present were unaware of his attendance. (Doc. 50-1 at 80:8–13, 175:23–176:16; Doc. 50-9 at 142:14–19). During the meeting, the Chief Operating Officer announced that Plaintiff should go to Albany, New York for the weekend to assist crews to prepare for a projected snowstorm. (Doc. 50-1 at 95:14–15, 138:3–4, 175:18–21, 176:17–21; Doc. 50-9 at 142:20–23). Plaintiff testified that although lead engineers might be dispatched ahead of an impending hurricane, they would not send someone in his position to address a forecasted snowstorm. (Doc. 50-1 at 95:23–96:6, 168:11–19, 170:10–12, 172:10–17, 178:23–179:8; Doc. 50-2 at 8). Although several witnesses testified that this would have been a routine trip, no one could recall specific instances of other similar employees being deployed to a snowstorm. (Doc. 50-1 at 177:2–11; Doc. 50-4 at 24:8–25:7, 26:12–17; Doc. 50-5 at 30:3–32:9; Doc. 50-6 at 15:20–16:8, 19:22–25; Doc. 50-9 at 41:3–42:16, 44:16–45:17, 51:1–12, 151:14–152:9).

Plaintiff travelled to Albany, as instructed, but began to feel that he was likely to be terminated based on the series of events that had transpired since he submitted his letter to Foote. (Doc. 50-1 at 93:7–17). Accordingly, on February 6, 2022, at roughly 11:15 p.m., Plaintiff sent an e-mail to Mellish notifying him that he was "retiring from CSX" and his "last day worked [wa]s 2/06/2022." (Doc. 50-2 at 56). Plaintiff then paid for his own return flight home from Albany. (Doc. 50-1 at 96:9–11).

Subsequent to his resignation, Plaintiff was employed first by Herzog, a railroad-related company that acted as a vendor to CSX. (Doc. 50-1 at 181:16–19; Doc. 50-9 at 117:2–4, 159:21–22). Plaintiff testified that, sometime in the summer 2022, Johnson called Herzog's COO and spoke disparagingly of Plaintiff and stated that Plaintiff was not permitted to contact anyone at CSX in the course of his duties with Herzog. (Doc. 50-1 at 76:3–12; Doc. 50-2 at 10, 35). Johnson does not believe that he made such a call and cannot recall if he did or did not contact Herzog; however, he testified that he frequently spoke with a higher up in Herzog on business matters and did inform him that CSX was happy with its current representative. (Doc. 50-9 at 160:2–163:1). Johnson testified that he did not, to the best of his knowledge, tell Herzog's COO that Plaintiff could not contact CSX and was not permitted on CSX property. (*Id.* at 163:18–164:1).

Plaintiff left Herzog for Amtrak in September 2022. (Doc. 50-2 at 43, 60–63). Mellish found out that Plaintiff intended to work for Amtrak and contacted Larry Biess, an Amtrak executive, to ask if Plaintiff was in fact working for Amtrak. (Doc. 50-6 at 22:17–23:5). Mellish knew Biess because Biess had previously worked at CSX. (*Id.* at 23:3–5). Plaintiff states that Mellish told Biess that Plaintiff left CSX on bad terms, that Plaintiff had CSX "up to [their] eyeballs in attorneys investigating" the company, and that Plaintiff was banned from the property. (Doc. 50-1 at 76:13–77:8; Doc. 50-2 at 10–11, 35). During the call, Mellish admits that he informed Biess that Plaintiff had left CSX under conditions that "were not good." (Doc. 50-6 at 23:10–13). Mellish testified that he was neither trying to help or hurt Plaintiff by contacting Biess and that he did not recall discussing the call with anyone at CSX. (*Id.* at 23:24–24:14).

As a result of the above actions and conduct by CSX after Plaintiff's letter to Foote, Plaintiff brings a one count Complaint against CSX for retaliation in violation of the Federal Railroad Safety Act ("**FRSA**"), 49 U.S.C. § 20101 *et seq.*  (*See generally* Doc. 1).

## II.      LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*  "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007).  Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quotation omitted).  The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Nevertheless, "[i]f there is a conflict between the parties' allegations or

evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor."  *Allen*, 495 F.3d at 1314.

## III.    DISCUSSION

As an initial matter, the parties dispute what claim is at issue in this litigation. Defendant argues that Plaintiff is limited to a claim for constructive discharge, while Plaintiff argues that he has alleged a number of actionable adverse employment actions and a more broad retaliation claim.  Setting aside exhaustion requirements, "[i]t is well settled that '[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.'"  *Varazo v. Keiser Corp.*, 754 F. App'x 918, 919 (11th Cir. 2018) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). Thus, the Court can decline to address claims that were not properly pleaded at the summary judgment stage.  *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1247 (11th Cir. 2007).

Having carefully reviewed the Complaint (Doc. 1), the Court does not agree that Plaintiff is limited solely to a constructive discharge claim.  Although Plaintiff does specifically reference constructive discharge in his factual allegations and invokes similar language in his cause of action, (*see id.* ¶¶ 8–9, 42), Plaintiff also references acts of retaliation, specifically notes in his factual allegations that he felt that certain acts were retaliatory, and alleges that Defendant "took the retaliatory actions" because of his protected activity in his cause of action, (*id.* ¶¶ 21, 34, 36, 43).  Additionally, Plaintiff specifically alleges two acts of post-resignation retaliation.  If Plaintiff intended to limit his pleading to only constructive discharge, such allegations would offer little to no support for his claim as obviously actions taken post-employment cannot contribute to a

7

constructive discharge.   Therefore, the Court finds that Plaintiff has alleged both constructive discharge and general retaliation under the FRSA.

Nevertheless, as Defendant notes, the FRSA also contains exhaustion requirements.  Pursuant to 49 U.S.C. § 20109(d)(1), any person alleging discrimination in violation of § 20109 must first file a complaint with the Secretary of Labor.  *See also Grantham v. CSX Transp., Inc.*, No. 2:19-CV-65, 2020 WL 13282047, at \*3 (S.D. Ga. Feb. 5, 2020).  "An employee exhausts his FRSA claim if the civil claim grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nix v. CSX Transp., Inc.*, No. 3:20-cv-250, 2022 WL 1746915, at \*8 (M.D. Fla. Mar. 29, 2022) (quotation omitted).[1]   Here, Plaintiff's Processed Online Complaint Summary specifically identifies "Constructive discharge" and "Termination, Other" as adverse actions, and the summary relies on the request to sign the non-compete as evidence that Plaintiff was on the verge of being "fired or forced out" if he did not resign.  (Doc. 50-2 at 14–15).  However, Plaintiff's Statement of the Case and Facts reads as a nearly verbatim recitation of the facts alleged in the pleading in this case.  (*Id.* at 17–23).  Although the allegations regarding the call to Amtrak were omitted, these allegations were subsequently disclosed in Plaintiff's interrogatory responses in the administrative proceeding.  (*Id.* at 35).  Because Plaintiff's OSHA complaint provided a list of specific

---

[1] Although the text of the FRSA's exhaustion requirement differs from the requirements of Title VII, numerous courts have applied the same standard in FRSA cases.  Defendant does not argue that a different standard is applicable and has cited cases applying the "generous standard applied under Title VII." *Foster v. BNSF Ry. Co.*, 866 F.3d 962, 966 (8th Cir. 2017); *see also Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891, 899–900 (D. Minn. 2015).  Absent controlling authority to the contrary or argument by Defendant that a different standard should apply in this case, the Court will apply the Title VII standard in this case with respect to exhaustion.

instances of retaliation and, like his judicial complaint, did not explicitly limit his claim to one for constructive discharge, the Court finds that Plaintiff's claims for retaliation have been administratively exhausted.  *See Grantham*, 2020 WL 13282047, at *5–6; *Head v. Norfolk S. Ry. Co.*, No. 2:15-cv-2118, 2017 WL 4030580, at *13 (N.D. Ala. Sept. 13, 2017).

Plaintiff alleges a single claim for retaliation in violation of the FRSA, which "prohibits railroad carriers from 'discharg[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee if such discrimination is due, in whole or in part, to' the employee participating in a protected activity." *Hitt v. CSX Transp., Inc.*, 116 F.4th 1309, 1315 (11th Cir. 2024) (quoting 49 U.S.C. § 20109(a)).  Enforcement actions brought pursuant to the FRSA are governed by the standards set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("**AIR 21**").  49 U.S.C. § 20109(d)(2)(A)(i); *see also* 49 U.S.C. § 42121(b).  Under the AIR 21 standard, "a plaintiff bears the burden of establishing that his protected activity was a contributing factor to an adverse employment action." *Hitt*, 116 F.4th at 1315.  To do so, "an employee must establish by a preponderance of the evidence that (1) he engaged in a protected activity; (2) the railroad knew, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse employment action; and (4) the protected activity was a contributing factor in the adverse action." *Id.* at 1315–16.  If the plaintiff meets his burden, an employer may avoid liability by "establish[ing] by clear and convincing evidence that, even though protected activity contributed to its decision, it would have taken the same adverse employment action in the absence of the protected activity." *Id.* at 1316.

Defendant does not dispute the first or second elements for purposes of summary judgment. Instead, Defendant argues that Plaintiff failed to present evidence of an adverse employment action. In addition to constructive discharge, Plaintiff argues the following adverse actions: (1) an unplanned meeting with Johnson and a human resources representative on January 21, 2022; (2) Plaintiff's interview with Jones Day; (3) the presentation of the non-compete agreement, which lacked a carve out for whistleblowers; (4) his last minute assignment to travel to Albany for a forecasted snowstorm; (5) Johnson's failure to conduct an annual meeting within the same timeframe as Plaintiff's counterparts; and (6) phone calls to his new employers in an attempt to blacklist him. The Court will first address each independent event before considering constructive discharge.

Although the Eleventh Circuit has not directly addressed the standard to be applied in FRSA cases to determine what constitutes an "adverse employment action," Defendant argues that the *Burlington*[2] standard—used in Title VII cases—should apply. "[U]nder *Burlington Northern*, in the context of a . . . retaliation claim, a materially adverse action means it well might have dissuaded a reasonable worker from making or supporting a charge." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quotation omitted); *see also Joyner v. City of Atlanta*, 170 F.4th 1320, 1338 (11th Cir. 2026). Furthermore, "a set of actions may constitute a materially adverse action when considered in the aggregate, even if individual actions do not rise to a materially adverse action." *Davis v. Fla. Agency for Health Care Admin.*, 612 F. App'x 983, 986 (11th Cir. 2015) (citing *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

---

[2] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Several courts in this Circuit have determined that the *Burlington* standard should apply because the language used in the FRSA does not materially differ from the language used in other retaliation statutes subject to the *Burlington* standard. *See Hitt v. CSX Transp., Inc.*, 672 F. Supp. 3d 1192, 1200–01 (N.D. Ala. 2023); *Singleton v. Norfolk S. Ry. Co.*, No. 1:19-CV-3133, 2023 WL 1768115, at *4 (N.D. Ga. Feb. 3, 2023); *Stapleton v. CSX Transp., Inc.*, 530 F. Supp. 3d 1128, 1143–47 (M.D. Fla. 2021). Additionally, the Eleventh Circuit has applied the *Burlington* definition of adverse employment action in at least one case involving the AIR 21 standard. *See Jacobs v. U.S. Dep't of Labor*, 806 F. App'x 832, 835 (11th Cir. 2020); *see also Smith v, Haynes & Haynes P.C.*, 940 F.3d 635, 648 (11th Cir. 2019) (applying *Burlington* to a fair labor standards act retaliation claim, which prohibits an employer from "in any other manner discriminating against an employee because such employee has filed any complaint" (quoting 29 U.S.C. § 215(a)(3))). The Court notes, however, that other courts have adopted the standard applied by the Administrative Review Board, which defines adverse actions as "unfavorable employment actions that are more than trivial, either as a single event or in combination with other deliberate employer actions alleged." *Fricka v. Nat'l R.R. Passenger Corp.*, ARB Case No. 14-047, ALJ Case No. 2013-FRS-035, 2015 WL 7904894, at *4–5 (DOL Admin. Rev. Bd. Nov. 24, 2015) (quotation omitted); *see also Thomas v. Union Pac. R.R. Co.*, 203 F. Supp. 3d 1111, 1121–22 (D. Or. 2016).

The Court need not determine which standard should apply in this case. Although Defendant argues that the meeting with Johnson, the interview, the last-minute weekend assignment to travel to a snowstorm, the delay in his yearly review meeting, and the non-compete agreement are not adverse actions, Defendant fails to address the post-

employment calls placed to Plaintiff's new employers.   The FRSA's implementing regulations specifically identify "blacklisting" an employee as an act of prohibited retaliation.  "A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way retaliate against, including but not limited to intimidating, threatening, restraining, coercing, blacklisting, or disciplining, an employee for . . . [r]eporting, in good faith, a hazardous safety or security condition."  29 C.F.R. § 1982.102(b)(2)(i).[3]

After he resigned from CSX, Plaintiff was employed first by Herzog.  Plaintiff testified that sometime in the summer 2022, Johnson called Herzog's COO and spoke disparagingly of Plaintiff and stated that Plaintiff was not permitted to contact anyone at CSX in the course of his duties with Herzog.  Although Johnson disputes the call, he testified that he frequently spoke with a higher up in Herzog on business matters and did inform him that CSX was happy with its current representative.

Plaintiff also testified that on or about August 30, 2022, Mellish called an Amtrak executive and told him that Plaintiff left CSX on bad terms, that Plaintiff had CSX "up to [their] eyeballs in attorneys investigating" the company, and that Plaintiff was banned from

---

[3] Furthermore, even under the more exacting *Burlington* standard, numerous courts have found that post-employment blacklisting is a materially adverse employment action. *See, e.g.*, *Hicks v. Lee Cnty. Sch. Dist.*, No. 2:15-cv-254-FtM, 2015 WL 6736748, at *3 (M.D. Fla. Nov. 4, 2015) ("The post-employment retaliation alleged in plaintiff's Complaint, namely blacklisting, is precisely the type of conduct that the Title VII anti-retaliation provision protects against." (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 345–46 (1997))); *Phillips v. M.I. Quality Lawn Maint., Inc.*, No. 10-20698, 2010 WL 4237619, at *5 (S.D. Fla. Oct. 21, 2010); *Forsberg v. Pefanis*, No. 1:07-CV-3116, 2009 WL 901015, at *15 (N.D. Ga. Jan. 26, 2009) (collecting cases), *report & recommendation adopted in part and rejected on other grounds in part*, 2009 WL 901012 (N.D. Ga. Mar. 27, 2009); *see also Stanley v. City of Sanford*, 83 F.4th 1333, 1339 (11th Cir. 2023) ("[W]e note that many retaliation claims are filed by former employees alleging, for example, post-employment blacklisting." (quotation omitted)).

the property.  (Doc. 50-1 at 76:13–77:8; Doc. 50-2 at 10–11, 35).  Mellish was familiar with Biess and does not dispute that he made the call.  Although Mellish does not recall referencing attorneys, he conceded that the alleged statement was accurate, and he did admit that he informed Biess that Plaintiff's departure from CSX was not made under good conditions.[4]

Taking the evidence in the light most favorable to Plaintiff, a reasonable jury could find that the phone calls to Plaintiff's subsequent employers and potential employers constituted impermissible blacklisting.  Specifically, the evidence, taken in the light most favorable to Plaintiff, reflects that Defendant contacted both of Plaintiff's new employers at or near the time of his employment.  While there is no indication that Herzog was made specifically aware of Plaintiff's protected activity, the alleged statements were clearly intended to cast Plaintiff in a negative light and cause damage to his reputation in the industry.  With respect to Amtrak, Mellish could not recall mentioning the attorneys and interviews, but also did not deny that it might have been discussed, directly linking his call

---

[4] Defendant makes a conclusory argument that Plaintiff fails to "cite any admissible *evidence* to defeat summary judgment" because the cited facts are "inadmissible hearsay." (Doc. 52 at 1).  Defendant does not specifically seek the exclusion of any evidence or further elaborate on what statements or evidence should be excluded from consideration. *W. Sur. Co. v. Steuerwald*, No. 16-61815-CV, 2017 WL 5248499, at *2 (S.D. Fla. Jan. 17, 2017) ("It is axiomatic that arguments not supported and properly developed are deemed waived."); *see also U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (noting that the court need not consider "perfunctory and underdeveloped" arguments and that such arguments are waived).  Nevertheless, although "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment, . . . a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quotations omitted).  Because Defendant fails to establish that any hearsay statements relied on by Plaintiff are inadmissible and cannot be reduced to admissible form by, for example, having the declarant testify at trial, any such objections to the evidence are overruled.

to Plaintiff's protected conduct.  Additionally, again the admitted contents of the call were certainly disparaging of Plaintiff and called his reputation in the business into question.  A reasonable jury could infer that these calls were made with ill intent toward Plaintiff. *Rowan v. Hayes Chrysler-Dodge-Jeep*, No. Civ.A.1:04CV1195, 2006 WL 825873, at *9–10 (N.D. Ga. Mar. 27, 2006); *Johnston v. Davis Sec., Inc.*, 217 F. Supp. 2d 1224, 1226, 1228–29 (D. Utah 2002); *see also Ammons v. Brantley Cnty. Bd. of Comm'rs*, No. 5:16-CV-78, 2017 WL 498718, at *1–3 (S.D. Ga. Feb. 6, 2017); *Hicks v. City of Alabaster*, No. 2:11-CV-4107, 2013 WL 988874, at *8 (N.D. Ala. Mar. 12, 2013).

While there is no evidence that either Herzog or Amtrak took any action against Plaintiff as a result of the calls, there is evidence that both were at least compelled to address the allegations with Plaintiff.  Furthermore, "a plaintiff is not required to prove that she lost her job, or failed to obtain new employment, as a result of the alleged adverse action in order to establish a prima facie case." *Goodgames v. Fulton Cnty. Sch. Dist.*, No. 1:09-CV-860, 2010 WL 11493519, at *17 (N.D. Ga. June 18, 2010), *report & recommendation adopted*, 2010 WL 11493526 (N.D. Ga. Aug. 20, 2010); *see also Equal Opportunity Emp. Comm'n v. Ga. Council for the Hearing Impaired, Inc.*, No. 1:13-CV-3144, 2015 WL 13358178, at *2 (N.D. Ga. Sept. 10, 2015) (collecting cases); *Phillips*, 2010 WL 4237619, at *5 (collecting cases).  The Court finds, therefore, that Plaintiff has presented a prima facie case of retaliation under the FRSA at this stage of the proceedings.  Because Defendant has failed to respond to the alleged blacklisting or offer any evidence that it would have placed the calls in the absence of protected activity, Defendant has not carried its burden and summary judgment will be denied.

## IV.    CONCLUSION

14

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. 49) is **DENIED**.

2. Defendant's Unopposed Motion to Extend Trial Brief Deadline (Doc. 61) is **GRANTED**.  The parties shall submit their joint final pretrial statement and trial briefs on or before **June 15, 2026**.

**DONE AND ORDERED** in Jacksonville, Florida on June 8, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

15